# UNITED STATES DISTRICT COURT
## DISTRICT OF DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARY P. MOORE, individually and on behalf of all others similarly situated, 13605 Sir Thomas Way, Apt. 13 Silver Spring, Maryland 20904 | ) ) ) ) ) | |
| Plaintiff, | ) ) | **CIVIL ACTION NO.** |
| v. | ) ) ) | CLASS ACTION COMPLAINT |
| FEDERAL NATIONAL MORTGAGE ASSOCIATION (a.k.a. "FANNIE MAE") COMPENSATION COMMITTEE 3900 Wisconsin Avenue NW Washington, D.C. 20016 | ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| FEDERAL NATIONAL MORTGAGE ASSOCIATION BENEFIT PLANS COMMITTEE 3900 Wisconsin Avenue NW Washington, D.C. 20016 | ) ) ) ) ) ) | |
| DANIEL H. MUDD C/O FANNIE MAE 3900 Wisconsin Avenue NW Washington, D.C. 20016 | ) ) ) ) ) | |
| STEPHEN B. ASHLEY C/O FANNIE MAE 3900 Wisconsin Avenue NW Washington, D.C. 20016 | ) ) ) ) ) | |
| LOUIS J. FREEH C/O FANNIE MAE 3900 Wisconsin Avenue NW Washington, D.C. 20016 | ) ) ) ) ) | |
| BRENDA J. GAINES C/O FANNIE MAE 3900 Wisconsin Avenue NW Washington, D.C. 20016 | ) ) ) ) ) | |

#965379v.1

BRIDGET A. MACASKILL )
C/O FANNIE MAE )
3900 Wisconsin Avenue NW )
Washington, D.C. 20016 )
)
GREG C. SMITH )
C/O FANNIE MAE )
3900 Wisconsin Avenue NW )
Washington, D.C. 20016 )
)
DAVID C. HISEY )
C/O FANNIE MAE )
3900 Wisconsin Avenue NW )
Washington, D.C. 20016 )
)
and )
)
JOHN DOES 1-10 )
C/O FANNIE MAE )
3900 Wisconsin Avenue NW )
Washington, D.C. 20016 )
)
                            Defendants. )
                                        )

Plaintiff Mary P. Moore ("Plaintiff"), a participant in the Federal National Mortgage Association Employee Stock Ownership Plan (the "ESOP") during the proposed Class Period (defined below), alleges as follows on behalf of the Plan, herself and a class of all others similarly situated:

## INTRODUCTION

1.     This is a class action brought pursuant to §§ 409, 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109, 1132, against Defendants, fiduciaries of the Plan.

2.     The Plan is maintained for the benefit of all eligible employees of Federal National Mortgage Association ("Fannie Mae" or the "Company")[1].  Plaintiff was employed by Fannie Mae and has been a participant in the Plan during the Class Period, during which time the Plan held interests in the Company's common stock.  Plaintiff's account in the Plan during the Class Period included Fannie Mae stock.

3.     Plaintiff alleges that Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties to her and to the other Plan participants and beneficiaries in violation of ERISA §§ 404(a), 405, 29 U.S.C. §§ 1104(a), 1105, particularly with regard to the Plan's heavy and continued investment in Fannie Mae common stock.

4.     Specifically, Count I alleges that certain Defendants, each having certain responsibilities regarding the management and investment of Plan assets, breached their fiduciary duties to him, the Plan and proposed Class by failing to prudently and loyally manage the Plan's investment in Company securities by (1) continuing to invest Plan assets in Fannie Mae common stock when it was imprudent to do so; and (2) maintaining the Plan's pre-existing heavy investment in Fannie Mae equity when Company stock was no longer a prudent investment for the Plan.  These actions/inactions run directly counter to the express purpose of ERISA pension plan, which are designed to help provide funds for participants' retirement.  See ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

---

[1] On September 7, 2008, Fannie Mae was placed into a government conservatorship, to be run by the Federal Housing Finance Agency.  Accordingly, while Fannie Mae was a fiduciary of the Plan during the Class Period (as further described herein) the Company is not currently named as a defendant in this action.  In the event that Fannie Mae is released from the government conservatorship, Plaintiff will notify the Court and will seek to name Fannie Mae as a defendant in this action.

5.    Count II alleges that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plan's and their participants' best interests in mind.

6.    Count III alleges that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plan to continue offering Fannie Mae stock as an investment option and investing Plan assets in Fannie Mae stock when it was no longer prudent to do so.

7.    Plaintiff alleges that Defendants allowed the heavy imprudent investment of the Plan's assets in Fannie Mae equity throughout the Class Period despite the fact that they clearly knew or should have known that such investment was imprudent because, as explained in detail below and among other things: (a) the Company was exposed to tremendous losses as the mortgage and housing markets deteriorated; (b) the enormous and ongoing decline in the U.S. mortgage and housing markets rendered the Company undercapitalized; (c) the Company had failed to adequately and prudently manage its level of risk with respect to its capitalization; and (d) heavy investment of Plan assets in Company stock would inevitably result in significant losses to the Plan, and consequently, to its participants.

8.    This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are liable pursuant to ERISA §§ 409, 502, 29 U.S.C. §§ 1109, 1132. Because Plaintiff's claims apply to the Plan, inclusive of all participants with accounts invested in Company stock during the Class Period, and because ERISA specifically authorizes participants such as Plaintiff to sue for relief to the Plan from breaches of fiduciary duty such as those alleged

herein, Plaintiff brings this as a class action on behalf of the Plan and all participants and beneficiaries of the Plan during the proposed Class Period.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

10.     Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary places of business in this district.

## PARTIES

### Plaintiff

11.     Plaintiff is a "participant" in the Plan, within the meaning of § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held Fannie Mae shares in her plan portfolio during the Class Period and continues to hold such shares in her plan portfolio.

### Defendants

### Director Defendants

12.     Fannie exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. Fannie Mae at all times acted through its officers, directors, and employees, including members of the Board of Directors' Compensation Committee ("Compensation Committee"), who were appointed by the Company to perform Plan-related fiduciary functions, and did so in the course and scope of their services for the Company.

13.    The Board of Directors (the "Board"), upon information and belief, has primary fiduciary oversight of the Plan.  Further, in addition to the Board collectively, the Compensation Committee, upon information and belief, is also a fiduciary of the Plan.

14.    Defendant Daniel H. Mudd ("Mudd") served as the Company's President and Chief Executive Officer ("CEO") and as a member of the Board during the Class Period. Defendant Mudd is a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

15.    Defendant Stephen B. Ashley ("Ashley") served as a Chairman of the Board and as a member of the Compensation Committee during the Class Period. Defendant Ashley is a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

16.    Defendant Louis J. Freeh ("Freeh") served as a member of the Board and as a member of the Compensation Committee during the Class Period. Defendant Freeh is a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

17.    Defendant Brenda J. Gaines ("Gaines") served as a member of the Board and as a member of the Compensation Committee during the Class Period. Defendant Gaines is a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that she exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

18. Defendant Bridget A. Macaskill ("Macaskill") served as a member of the Board and as Chair of the Compensation Committee during the Class Period. Defendant Macaskill is a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that she exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

19. Defendant Greg C. Smith ("Smith") served as a member of the Board and as a member of the Compensation Committee during the Class Period. Defendant Smith is a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

**Benefit Plans Committee Defendants/Officer Defendants**

20. Upon information and belief, the Benefit Plans Committee was delegated certain fiduciary responsibilities concerning the administration and management of the Plan and the Plan's assets. *See* 2006 Form 5500.

21. Defendant David C. Hisey ("Hisey") served as Fannie Mae's Senior Vice President and Controller during the Class Period and, on August 27, 2008, was named Executive Vice President and Chief Financial Officer ("CFO") of the Company. On or about September 12, 2007, Defendant Hisey signed the Plan's 2006 Form 5500 submission to the IRS and Department of Labor as the "individual signing as plan administrator." Upon information and belief, Defendant Hisey served as a member of the Benefit Plans Committee, as well. Defendant Hisey was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

**Additional "John Doe" Defendants**

22.     Without limitation, unknown "John Doe" Defendants 1-10 include other Company officers, directors and employees who are or were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period. The identities of the John Doe Defendants are currently unknown to Plaintiff; once their identities are ascertained, Plaintiff will seek leave to join them to the instant action under their true names.

## THE PLAN

23.     The Plan is an "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A). The relief requested in this action is for the benefit of the Plan and their participants/beneficiaries.[2]

24.     The Plan is a legal entity that can sue or be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is neither a plaintiff nor a defendant. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan. Stated differently, in this action, Plaintiff seeks relief that is "plan-wide."

25.     During the Class Period, the Plan was available to qualified employees regularly scheduled to work a minimum of 1,000 hours per calendar year and are not participants in the Company's Executive Pension Plan.

26.     Provided the Company achieves certain defined corporate earnings goals, the Company could contribute up to 4 percent of the aggregate eligible salary of all participants in the Plan. The Board determined the exact amount to be contributed in any given year. The

---

[2] The Plan was amended to freeze participation in the Plan as of December 31, 2007 and to provide that no contributions subsequent to the 2008 contribution for 2007 would be made to the Plan. On January 28, 2008, Fannie Mae made a final contribution of 347,757 shares to the Plan. As part of the changes to the Plan, the accounts of all current employees have been fully vested.

Company's contribution was made in the form of either Fannie Mae common stock or cash to purchase shares of Fannie Mae common stock.

27. Each participant of the Plan had Company stock in his/her Plan account during the Class Period.

28. Participants were 100% vested in their accounts either upon attainment of age 65 or five years of service.

29. Employees were not permitted to diversify their Plan investments unless and until they reached age 55 and had at least 10 years of participation in the Plan. Only then could employees diversify by rolling over all or a portion of the value of their Plan account into investment funds available under the Company's 401(k) plan.

30. As of December 31, 2006, the ESOP held over $104 million in Company stock.

## CLASS ACTION ALLEGATIONS

31. Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan, at any time between April 17, 2007 and the present (the "Class Period") and whose Plan accounts included investments in Fannie Mae common stock.

32. The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period and whose Plan accounts included investment in Fannie Mae stock.

33. Common questions of law and fact exist as to all Class members and predominate

over any questions affecting solely individual Class members. Among the questions of law and fact common to the Class are whether:

     (a)    Defendants each owed a fiduciary duty to the Plan, Plaintiff and members of the Class;

     (b)    Defendants breached their fiduciary duties to the Plan, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

     (c)    Defendants violated ERISA; and

     (d)    the Plan and members of the Class have sustained losses and, if so, the proper measure of such losses.

34.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff, the Plan and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

35.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Plan or the Class.

36.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of members not parties to the actions, or substantially impair or impede their ability to protect their interests.

37.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANTS' FIDUCIARY STATUS

38.     During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

39.     During the Class Period, each Defendant acted as a fiduciary of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

40.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). Upon information and belief, the Company, the Board, the Compensation Committee and the Benefit Plans Committee were named fiduciaries of the Plan.

**Director Defendants' and Compensation Committee's Fiduciary Status**

41.     Instead of delegating fiduciary responsibility for the Plan to external service providers, Fannie Mae chose to internalize certain vital aspects of this fiduciary function. The Plan was administered through the Board and the Compensation Committee.

42.     Upon information and belief, the Board has primary oversight of the Plan. Indicative of its authority, the Board determines the contribution percentage annually that the Company made to the Plan, in the form of either Company stock or cash to purchase Company stock, according to the Company's Annual Report for year ending December 31, 2007 and filed

with the Securities and Exchange Commission ("SEC") on February 27, 2008 (the "2007 10-K"). The Board was also responsible for appointing, monitoring, and, if necessary, removing members of the Compensation Committee and the Benefit Plans Committee.

43.    Ultimately, however, the Board collectively retained responsibility for the Compensation Committee's actions, evidenced by the fact that the Compensation Committee was appointed by the Board and required to report regularly to the Board on its activities. Further, each member of the Compensation Committee, by virtue of his/her committee position, was a member of the Board and therefore also had fiduciary responsibility to the Plan and its participants in that regard.

**Compensation Committee's Fiduciary Status**

44.    Further, in addition to the Board collectively, the Board's Compensation Committee, upon information and belief, is also a fiduciary of the Plan.  According to the Compensation Committee's charter, part of its purpose is "to oversee and advise the Board on the adoption of policies that govern certain annual compensation and stock ownership plans." The Compensation Committee's duties include, among others:

(a)    periodically reviewing the corporation's employee benefits and retirement programs;

(b)    overseeing compensation policies and plans for officers and other management group employees and key compensation and benefits programs governing employees of the corporation;

(c)    making recommendations to the Board with respect to Fannie Mae's incentive-compensation plans and stock-based plans that are subject to Board approval; and

(d) performing the functions assigned to it under the corporation's various compensation and benefit plans and arrangements or by the Board with respect to those plans and arrangement.

*See* Compensation Committee Charter, available at: http://www.fanniemae.com/governance/ (accessed September 8, 2008).

**Benefit Plans Committee Defendants/Officer Defendants' Fiduciary Status**

45. Upon information and belief, the Benefit Plans Committee was delegated certain fiduciary responsibilities concerning the administration and management of the Plan and the Plan's assets. *See* 2006 Form 5500. Upon information and belief, the Benefit Plans Committee is a committee appointed by the Board and delegated the day-to-day responsibility for the administration of the Plan. The Benefit Plans Committee is likely a "Named Fiduciary" for purposes of Section 402(a)(2) of ERISA.

**<u>Additional Fiduciary Aspects of Defendants' Actions/Inactions</u>**

46. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, performed fiduciary functions. Section 3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . . ." During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

47. Further, ERISA mandates that pension plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the Plan and its participants when communicating with them. A fiduciary's duty of loyalty to plan participants

under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries. "[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996).

48. Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct the inaccurate or misleading information so that plan participants will not be injured. *See, e.g., In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 767 (S.D.N.Y. 2003) ("An ERISA fiduciary may not knowingly present false information regarding a plan investment option to plan participants."); *Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 381 (4th Cir. 2001) ("[An] ERISA fiduciary that knows or should have known that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment cannot remain silent – especially when that misunderstanding was fostered by fiduciary's own material representations or omissions."); *Matthews v. Chevron Corp.*, 362 F.3d 1172, 1180 (9th Cir. 2004); *Bixler v. Central Penn. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3rd Cir. 1993).

49. A plan fiduciary also "has an affirmative duty to inform beneficiaries of circumstances that [as alleged herein] threaten the funding of benefits." *Acosta v. Pacific Enter.*, 950 F.2d 611, 619 (9th Cir. 1991); *see also In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 767 (S.D.N.Y. 2003)("There is no exception to the obligation to speak truthfully when the disclosure concerns the employer's stock.")

50. During the Class Period, upon information and belief, Defendants made direct and indirect communications with the Plan's participants including statements regarding investments in Company stock. These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions ("SPDs")

and/or prospectuses regarding Plan/participant holdings of Company stock), which included and/or reiterated these statements. Upon information and belief, at all times during the Class Period, the Company's SEC filings were incorporated into and part of the SPDs, and/or a prospectus and/or any applicable SEC Form S-8 registration statements. Defendants also acted as fiduciaries to the extent of this activity.

## DEFENDANTS' CONDUCT

### A.   BACKGROUND ON FANNIE MAE

51.   Fannie Mae is a federally chartered corporation that maintains its principal place of business in this judicial district at 3900 Wisconsin Avenue NW, Washington, DC 20016.

52.   Fannie Mae, a government-sponsored enterprise ("GSE") chartered by the U.S. Congress, is a shareholder-owned mortgage-investment company that purchases loans from commercial banks and lenders, then either keeps the mortgages or sells them in investment products known as "mortgage-backed securities." Ultimately, these transactions give the primary lenders additional funds to make further loans to other home-buyers.

53.   Fannie Mae was created in 1938, under President Franklin D. Roosevelt. The government established Fannie Mae in order to expand the flow of mortgage funds and to increase home ownership levels. In 1968, Fannie Mae was re-chartered by Congress as a shareholder-owned company, funded solely with private capital raised from investors on Wall Street and around the world.

54.   Fannie Mae's role in the U.S. mortgage market is substantial. As of September 30, 2007, the latest date for which information was available, the amount of U.S. residential mortgage debt outstanding was estimated by the Federal Reserve to be approximately $11.8 trillion (including $11.0 trillion of single-family mortgages). Fannie Mae's

mortgage credit book of business, which includes mortgage assets it holds in its investment portfolio, its Fannie Mae mortgage-backed securities ("Fannie Mae MBS") held by third parties and credit enhancements that it provides on mortgage assets, was $2.8 trillion, or approximately 23% of total U.S. residential mortgage debt outstanding. *See* 2007 10-K.

## B.   CRISIS WITHIN THE MORTGAGE MARKET

55.     During the Class Period, the U.S. mortgage market experienced a tremendous downturn, initiated and fueled by falling home values, rising interest rates and the proliferation of alternative, high-risk mortgage loans.  The mortgage crisis was precipitated by problems within the subprime mortgage sector and rapidly spread to other areas of the market, including the market for high-risk alternative loan products.

56.     The corresponding surge in mortgage loan defaults resulted in a huge increase in exposure to losses for Fannie Mae, as the Company bore the credit risk and interest-rate risk for the loans its purchased and held.

57.     Alternative loan products have been heavily marketed to both subprime and Alt-A borrowers.  Such products include adjustable rate mortgages ("ARMs"), interest-only loans, 80-20 loans and option ARMs.  Such mortgage loans represent a greater risk to lenders than prime mortgage loans.

58.     Industry experts have attributed the proliferation of subprime loans to a confluence of factors in 2004 and 2005, including rising home prices, declining affordability, historically low interest rates, intense lender competition, innovations in the structure and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors.  *See* Sandra L. Thompson, Dir., Div. of Supervision and Consumer Prot., *Testimony Before the Committee on Banking, Housing and Urban Affairs, U.S. Senate: Federal Deposit*

*Insurance Corporation on Mortgage Market Turmoil: Causes and Consequences*, Mar. 22, 2007, *available at* http://www.fdic.gov/news/news/speeches/chairman/ spmar22071.html.

59.     On information and belief, in 2004, as interest rates began to climb, the pool of potential prime borrowers looking to refinance began to dry up and lenders began extending loans to subprime borrowers with troubled credit histories in an effort to maintain or grow market share in a declining origination environment.

60.     To take advantage of this new market, many lenders lowered their underwriting standards, including:

    (a)    Reducing the minimum credit score borrowers need to qualify for certain loans;

    (b)    Allowing borrowers to finance a greater percentage of a home's value or to carry a higher debt load;

    (c)    Introducing new products designed to lower borrowers' monthly payments for an initial period; and

    (d)    Allowing borrowers to take out loans with little, if any, documentation of income and assets.

*See* Ruth Simon, *Mortgage Lenders Loosen Standards – Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005, at D1.

61.     In addition to lowering underwriting standards, lenders introduced new loan products, which enticed borrowers but also put them at greater risk of default:

    (a)    No-documentation and low-documentation loans:  Known in the industry as "liar loans," the practice of requiring little or no documentation from borrowers constituted as much as 40 percent of subprime mortgages issued in

2006, up from 25 percent in 2001. *See* Gretchen Morgenson, *Crisis Looms In Mortgages*, N.Y. Times, Mar. 11, 2007.

(b)    Piggy-back loans:  These combine a mortgage with a home-equity loan or line of credit, allowing borrowers to finance more than 80 percent of the home's value without paying for private mortgage insurance.  As of 2006, about half of all subprime loans included "piggyback" loans, and on average all borrowers financed 82 percent of the underlying value of their property, markedly up from 48 percent in 2000. *See Id.*; James R. Hagerty & Ruth Simon, *Home Lenders Pare Risky Loans – More Defaults Prompt Cut in 'Piggyback' Mortgages; Housing Market May Suffer*, Wall St. J., Feb. 14, 2007, at A3.

(c)    Interest-only mortgages:  These allow borrowers to pay interest and no principal in the loan's early years, which keep payments low for a time, but require that the deferred payment of principal be made in the future through increased monthly or balloon payments.

(d)    Option adjustable-mortgages:  The most prevalent of these are hybrid ARMs, loans marketed with promotional or "teaser" rates during an introductory period that later balloon to much higher rates, once the introductory period has ended.  ARMs currently account for between one-half and one-third of subprime mortgages. *See* Testimony of Roger T. Cole, Director, Division of Banking Supervision and Regulation, The Federal Reserve Board, *Mortgage Markets*, Before the Committee on Banking, Housing and Urban Affairs, U.S. Senate, Mar. 22, 2007, *available at*

http://www.federalreserve.gov/boarddocs/testimony/2007/20070322/default.htm.

62.     In 2006, lenders made $640 billion in subprime loans, nearly twice the value of subprime loans made in 2003, according to *Inside B&C Lending. See New Century Files for Chapter 11 Bankruptcy*, CNNMoney.com, April 3, 2007 *available at* http://money.cnn.com/2007/04/02/news/companies/new_century_bankruptcy/

63.     In 2006, subprime lending amounted to approximately 20 percent of the nation's mortgage lending and approximately 17 percent of home purchases. *Id.*

64.     Accordingly, then, Fannie Mae's exposure to losses began to increase exponentially.

## C.     THE HOUSING BUBBLE BURSTS

65.     Throughout the housing boom, lenders made increasingly risky loans because they could (and did) collect exorbitant commissions and other fees by originating or buying and subsequently selling the loans to other entities.  Essentially, lenders were able to make large fees and commissions and then make the loans "someone else's problem."  This led to a pervasive practice of making as many loans as possible as quickly as possible to reap the maximum amount of fees and commissions with little regard for credit risk.

66.     As early as 2004, industry watchdogs began expressing growing fears that relaxed lending practices were increasing risks for borrowers and lenders in overheated housing markets. *See* Simon, *Mortgage Lenders, supra.*  As lenders made it easier for borrowers to qualify for a loan by the practices described above, they were also greatly increasing the likelihood that borrowers would be unable to make payments, and that defaults would rise.  Of particular

concern was the prevalence of adjustable-rate loans, which, in combination with the lowered lending standards, were more likely to result in borrowers' early payment defaults.

67.     In May 2005, bank regulators issued their first-ever guideline for credit-risk management for home-equity lending and, in December 2005, new guidelines for mortgage lenders were issued as well. *Id.*; Testimony of Sandra L. Thompson, *supra*. The proposed "Interagency Guidance on Nontraditional Mortgage Product Risks" sent a clear message to the marketplace that bank regulators were concerned about the lessened underwriting standards and general lax risk management practices of subprime lenders.

68.     In 2005 and 2006, the Federal Reserve instituted a series of interest rate hikes, leading to the rise of interest rates on variable rate loans, including mortgage loans. Subprime borrowers able to afford the initially low "teaser rate" loan payments could no longer meet their monthly payment obligations. At the same time, home values began to decline sharply, leading some borrowers to walk away from loans when they could not afford the increased monthly mortgage and could not readily re-sell the property for a profit. As a result, many borrowers no longer paid their mortgages, causing defaults to increase significantly.

69.     As of mid-2005, delinquency rates for subprime loans (60-days or more past due) rose for the first time since 2002. By the fourth quarter of 2005, delinquencies and foreclosures began to rise even more sharply -- as of October 2005 the delinquency rate was twice that recorded on new subprime loans a year earlier. *See* Simon & Hagerty, *More Borrowers*, *supra*.

70.     According to the FDIC, total subprime delinquencies rose from 10.33 percent in the fourth quarter of 2004 to 13.33 percent in the fourth quarter of 2006 and foreclosures rose from 1.47 percent to 2.0 percent over the same period. Testimony of Sandra L. Thompson, *supra*.

71. Subprime ARM loans accounted for the largest rise in delinquency rates, an increase from 9.83 percent to 14.44 percent between the fourth quarter of 2004 and the fourth quarter of 2006; whereas foreclosures rose from 1.5 percent to 2.7 percent during the same period. *Id.*

72. In 2006 alone, roughly 80,000 subprime borrowers fell into delinquency, many shortly after origination. *See* Simon & Hagerty, *More Borrowers*, *supra.*

73. The imminent collapse of the subprime lending industry was widely documented. In December 2006, the Center for Responsible Lending issued a report predicting the worst foreclosure crisis in the modern mortgage market. Ron Nixon, *Study Predicts Foreclosure For 1 In 5 Subprime Loans*, N.Y. Times, Dec. 20, 2006. Shortly after, several major mortgage lenders disclosed extraordinary rates of loan defaults, triggering inquiries from the SEC and FDIC.

74. An April 2006 report by the Mortgage Asset Research Institute analyzed one hundred loans in which the borrowers merely stated their incomes. The Mortgage Asset Research Institute then compared that data with the documents those borrowers had filed with the Internal Revenue Service. In 90 percent of loans, borrowers had overstated their incomes 5 percent or more. In almost 60 percent of loans, borrowers overstated their incomes by more than 50 percent. *See* Gretchen Morgenson, *Crisis Looms in Market for Mortgages*, New York Times, March 11, 2007.

**D.  AS THE HOUSING BUBBLE BURST, FANNIE MAE TOOK ON EXCESSIVE RISK, WITH INSUFFICIENT CAPITAL**

75. In January 2007, according to the Washington Post, Defendant Mudd sent a confidential memo to the Board, touting Fannie Mae's expansion into the subprime mortgage market. Just one month later, in February 2007, Fannie Mae, while recognizing the poor performance of subprime loans, predicted that their performance would improve in 2007 and, in

an effort to increase its market share, outlined plans to increase its involvement in the subprime mortgage market. *See* David S. Hilzenrath, *Fannie's Perilous Pursuit of Subprime Loans*, Washington Post (August 19, 2008), at D1.

76. The Washington Post has reported that Fannie made plans to specifically target both Alt-A and subprime mortgage loans, with a stated objective to "increase our penetration into subprime." *Id.*

77. On April 17, 2007, the first day of the Class Period, Fannie Mae announced to the House Financial Services Committee that it would increase its involvement in the subprime mortgage market by offering expanded programs aimed at borrowers with poor credit histories. Under the program, Fannie Mae would ease its credit requirements and buy 40-year loans as well as 30-year loans in the secondary market. *See Fannie Mae, Freddie Mac Look at New Loans*, MSNBC.com (April 17, 2007).

78. Initially, subsequent to Fannie's Mae's commitment to become more involved the subprime mortgage market, the Company's stock continued to trade at high levels. In early June of 2007, one Morgan Stanley analyst raised his 12-month target price for Fannie Mae shares to $81.

79. On September 12, 2007, despite having earlier been rejected, Fannie Mae issued a call for the relaxation of restrictions on its ability to expand its mortgage-related portfolio. Defendant Mudd, speaking to the National Association of Credit Unions, also downplayed the seriousness of the mortgage crisis and stated, "we're in a growth market." *See* Pete Kasperowicz, *Fannie Mae Renews Pitch to Add Liquidity to Market by Lifting Caps*, Forbes.com (September 12, 2007).

80.     On September 19, 2007, the Office of Federal Housing Enterprise Oversight (the "OFHEO") slightly loosened the cap on Fannie Mae's portfolio. It said that Fannie Mae could increase its portfolio at a rate of 2 percent annual growth and not more than 0.5 percent per quarter. In response to Fannie Mae's expressed desire to increase its stakes in the subprime mortgage sector by buying billions of dollars in subprime mortgages, the OFHEO gave Fannie Mae additional flexibility to purchase subprime mortgages and refinanced loans for borrowers with lower credit scores. As one Standard & Poor's analyst noted, "If they went full out buying subprime, that would be detrimental to them." *See* Neil Adler, *Lifting Portfolio Cap Could Hurt Fannie, Freddie*, Washington Business Journal (October 5, 2007) (quoting Standard & Poor's analyst Stuart Plesser). However, Fannie Mae increased its exposure to subprime-related mortgage losses by buying bonds backed by such loans.

81.     In October 2007, Fannie Mae indicated its desire to have the government-imposed cap on its mortgage-related portfolio loosened; thus, permitting the Company to increase the size of its mortgage-related portfolio. At the time, OFHEO Director James Lockhart expressed concern regarding Fannie Mae's attempt to enlarge its portfolio, stating that, should the company take on too much risk, it "certainly could affect their financial results." In response, Fannie Mae executives declined comment, saying that "it would be inappropriate to speculate on how increasing their portfolios would affect the company's financial results" and, further, indicated that the Company would like to raise its portfolio cap by at least 10 percent. *See* Neil Adler, *Lifting Portfolio Cap Could Hurt Fannie, Freddie*, Washington Business Journal (October 5, 2007).

82.     On November 9, 2007, Fannie Mae filed quarterly reports for the first three quarters of 2007. The Company revealed a substantial drop in net income—a $2 billion drop

compared to the prior year period. Fannie Mae also indicated that its credit-related expenses had increased by $1.6 billion over the prior year period and that its credit losses had risen $477 million to $799 million during the first three quarters of 2007. The Company also issued a 2007 Q1-Q3 Investor Summary presentation in which, rather than focus on its exposure to losses and capitalization problems, the Company indicated it would seek to have restrictions on its mortgage-related portfolio lifted, stating that it was better positioned for relief from its capital surplus requirement and portfolio cap. The Company also stated, "The company is in solid shape to support the market, and is in better shape to benefit when the market correction ends." *See* Fannie Mae Form 8-K Submission to the SEC, filed November 9, 2007.

83. Also on November 9, 2007, during a conference call with investors, Fannie Mae indicated that it had not significantly written down the market value of its subprime and Alt-A mortgage-backed bonds—signaling to investors that the Company would not be taking large losses on those bonds.

84. On November 16, 2007, shares of Fannie Mae stock dropped 11% to as low as $38.38 per share, amid growing concerns that, as outlined in a Fortune report earlier that week, due to a change in the way Fannie Mae calculated its credit loss ratio, the Company's exposure to mortgage-related losses might be larger than Fannie Mae had previously disclosed. However, the Company attempted to reassure the market and downplayed its losses. In a conference call with investors, Fannie Mae's then CFO Stephen Swad stated that the Company would likely recover some of the $670 million in provisions for credit losses it had written off during the third quarter of 2007. *See* Andrew Farrell, *Fannie Mae Spooks Shareholders*, Forbes.com (November 16, 2007); *See also* Peter Eavis, *More Doubts About Fannie Mae's Disclosures*, CNNMoney.com (November 16, 2007).

85. On November 27, 2007, the OFHEO announced that certain restrictions on Fannie Mae's ability to purchase loans would not be increased. Specifically, the maximum conforming loan limit for Fannie Mae would remain at its current level--$417,000 for one-unit properties.

86. On December 4, 2007, Fannie Mae announced that, in an effort to raise additional capital, it would reduce its dividend by 30% and issue $7 billion of preferred stock in one or more offerings throughout the month. The Company stated that the stock sale would provide Fannie Mae with additional funds to help it manage higher risk in the housing and credit markets. Additionally, the Company indicated that the stock sale would "free up capital to pursue emerging growth opportunities." *See* Fannie Mae Form 8-K Submission to the SEC, filed December 4, 2007.

87. On the same day, as mortgage loan defaults continued to rise, CNN reported that the combined value of Fannie Mae's subprime and Alt-A mortgage-backed bonds was $76 billion—almost double Fannie Mae's $40 billion of capital. *See* Peter Eavis, *Fannie Mae Could Face More Losses*, CNNMoney.com (December 4, 2007). On December 4, 2007, Fannie Mae stock closed at $35.18 per share.

88. On February 27, 2008, Fannie Mae reported its fourth quarter and full year 2007 financial results, reporting a net loss of $2.1 billion, or ($2.63) per diluted share, versus net income of $4.1 billion during 2006. The Company also reported substantial losses from subprime and Alt-A mortgages. On the same day, on a conference call with investors, the Company assured them that it was taking a conservative approach to managing capital. Defendant Mudd stated, "there are no current plans to go back to the market for capital."

89. On Monday, March 10, 2008, Fannie Mae shares plunged 13%, following a weekend report in Barron's that the Company may need to bailed out by the federal government.

90.     As of the end of trading on March 10, 2008, Fannie Mae's shares were down 72% from their 52-week high of $70.57 per share.

91.     On March 19, 2008, the OFHEO announced that it was loosening capital requirements on Fannie Mae. Fannie Mae's capital surplus requirement would be reduced from 30% to 20%--in other words, the Company was enabled to reduce its capital on hand to cover its losses.

92.     On May 6, 2008, Fannie Mae announced a $2.2 billion quarterly loss, as well as a dividend cut. The Company also announced it would raise $6 billion in new funds. However, the Company downplayed its exposure to losses and lack of adequate capitalization and sought to dispel concerns pertaining to its financial health. On a conference call with investors, Defendant Mudd acknowledged that rising loan defaults had spread from subprime to higher-quality mortgage loans, but stated that, as the market recovered, Fannie Mae would be a "prime beneficiary" and "feast" on the mortgages it was currently buying.

93.     On May 16, 2008, Fannie Mae announced that it was lowering, on a nationwide basis, the amount of required down payments on mortgages it purchases, meaning that it would purchase loans with higher loan-to-value ratios.

94.     On June 25, 2008, Fannie Mae reported a two-fold increase in mortgage delinquency rates over the prior year period, but added, "We're managing our portfolio in a safe and sound manner." *See* David S. Hilzenrath, *Delinquencies Rise at Fannie Mae, Freddie Mac*, Washington Post (June 26, 2008), at D1.

## E.     THE TRUTH BEGINS TO EMERGE

95.     Despite Fannie Mae's representations regarding its management of its portfolio and capital reserves, in truth, the Company was severely undercapitalized.

96.     On July 7, 2008, Lehman Brothers Equity Research published an analyst report stating that the Financial Accounting Standards Board was considering a new rule that could include removing the qualified special purpose entity concept from what is known as FAS 140, which would have the effect of requiring off-balance-sheet assets to be brought onto balance sheets. Fannie Mae had $2.27 trillion in off-balance-sheet mortgage-backed securities. If forced to bring those securities onto its balance sheets, Fannie Mae's capital requirements would jump by more than $46 billion.

97.     Following this news, Fannie Mae's stock declined from a closing price on the previous trading day of $18.78 per share to $15.74 on July 7, 2008, a 16% drop.

98.     On July 9, 2008, Bloomberg reported that, despite having been given a credit rating of Aaa by Moody's Investors Service, credit default swaps tied to Fannie Mae were trading at prices implying a rating five levels lower, or A2.  As Bloomberg reported, Friedman, Billings, Ramsey & Co. analyst Paul Miller observed, "Fannie and Freddie are going to have to raise more capital and nobody thinks they're going to be able to raise capital when they need to. It's going to be very expensive."

99.     On July 9, 2008, Fannie Mae priced a new $3 billion issue of two-year benchmark notes at a yield of 3.272%, marginally higher than the coupon of 3.25%, an indication that investors were demanding a higher yield – and lower price – before they would buy the debt. The spread, 74 basis points more than treasuries, was the widest since Fannie Mae first sold two year notes in 2000 and triple what it paid in June 2006.

100.    On July 10, 2008, former St. Louis Federal Reserve Board President William Poole stated in an interview that Fannie Mae was technically insolvent.  Subsequently, Fannie Mae shares dropped another 14% to close at $13.20 per share.

101.    On July 11, 2008, *The New York Times* published an article titled "U.S. Weighs Takeover of Two Mortgage Giants," indicating that the federal government was considering a plan to take over Fannie Mae and place it into a conservatorship.

102.    Following this news, Fannie Mae's stock plummeted 22% to close at $10.25 per share.

103.    The next day, on July 1, 2008, Fannie Mae released a "Statement by Chuck Greener, Senior Vice President; on Fannie Mae's Capital Adequacy." Therein, the Company provided reassurances that it had adequate capital, stating, "In fact, we have more core capital, and a higher surplus over our regulatory requirement, than at any time in this company's history." However, the Company still failed to note that, regardless of its surplus over the regulatory minimum, it lacked adequate capital to cover its losses.

104.    On July 30, 2008, President Bush signed a housing rescue bill which included a Fannie Mae bail out. Specifically, it provided Fannie Mae with an unlimited line of credit at the U.S. Treasury (increased from $2.25 billion) and authorized the Treasury to purchase shares in Fannie Mae, if necessary. However, even this measure would prove to be insufficient.

105.    On August 8, 2008, Fannie Mae filed its Form 10-Q for the quarter ended June 30, 2008, indicating a $2.3 billion loss during the quarter, compared to a profit of $1.95 billion during the similar prior year period. The Company also cut its dividend to 5 cents per share from 35 cents per share and announced that it would no longer purchase Alt-A loans.

106.    On September 2, 2008, Fitch Ratings lowered its rating on Fannie Mae preferred stock to just one level above junk status, citing: (a) Fannie Mae's lack of capitalization due to its lack of reliable access equity markets; (b) Fannie Mae's $307 billion in Alt-A mortgages. *See*

Jeff Clabaugh, *Fannie Mae, Freddie Mac Preferred Stock Cut at Fitch*, Washington Business Journal (September 2, 2008).

107.    On September 7, 2008, Fannie Mae was placed into a government conservatorship, to be run by the Federal Housing Finance Agency.  Further, the Company's top executives were ousted and replaced.

108.    On September 9, 2008, Standard & Poor's announced that, following the close of trading on September 10, 2008, it would remove Fannie Mae from the S&P 500, citing the fact that the Company's capitalization had fallen well below the $5 billion required to list among the S&P 500.

109.    Since the beginning of the Class Period, the Plan's assets have been absolutely decimated.  As of December 31, 2006, when Fannie Mae stock was valued at $59.39 per share, the Plan held 1,761,599 shares of Fannie Mae common stock, valued at $104,621,374.  As of September 16, 2008, Fannie Mae stock closed at $0.48 per share.  However, despite that fact that they knew or should have known that Fannie Mae stock was an imprudent Plan investment, Defendants failed to protect the Plan's assets from suffering enormous, devastating losses.  As a result of Defendants' conduct, the Plan and, consequently, its participants, suffered immensely.

**F.    Defendants Knew or Should Have Known That Fannie Mae Stock Was an Imprudent Investment for the Plan, Yet Failed to Protect the Plan's Assets.**

110.    Throughout the Class Period, Fannie Mae was exposed to and suffered substantial losses.  As the Company's problems continued throughout the Class Period, Defendants knew or should have known that the value of the Company's stock would suffer and, consequently, that the heavy investment of Plan assets in Company stock would inevitably result in significant losses to the Plan, and consequently, to its participants.  However, Defendants did nothing to protect the heavy investment of Plan participants' retirement savings in Fannie Mae stock.

111.    Defendants knew or should have known that Fannie Mae stock was not a prudent investment for the Plan's assets. Fannie Mae was shouldering the credit risk for billions of dollars in bad loans. Further, Fannie Mae's tremendous problems were more than merely the result of downturns in the mortgage and housing markets. As Fannie's former government supervisor, Armando Falcon, noted:

> The statements by Paulson and Lockhart that this is nobody's fault, just a flaw in the business models and the housing downturn, that's ridiculous. [Fannie Mae] made a conscious decision to take on excessive risk in order to maximize profits and bonuses.

*See* Christopher Condon, *Paulson Taps Allison, Moffett to Run Fannie, Freddie*, Bloomberg.com (September 9, 2008). At the very least, as one analyst observed, Fannie Mae was "very slow to recognize the depth of the problems or to raise enough capital to deal with it." *Id* (quoting Friedman Billings Ramsey & Co. analyst Paul Miller).

112.    Defendants reassured and/or misled investors and Plan participants during the Class period, regarding Fannie Mae's actual financial condition, and failed to protect the heavy investment of Plan assets in Fannie Mae common stock.

113.    Fannie Mae's dissemination of inaccurate, incomplete and materially misleading statements regarding management of its portfolio and the adequacy of its capitalization prevented the market from realistically assessing the Company and its financial well-being, thus resulting in the overvaluation and artificial inflation of its stock price. Defendants also knew or should have known that the Company's stock price would plummet—and that the Plan's assets would suffer tremendously and unnecessarily—once the truth became known. Further, Defendants knew that the majority of Plan participants were prohibited from diversifying their Plan accounts.

114.    As a result of the enormous erosion of the value of Company stock, the Plan's assets, which were invested almost entirely in Fannie Mae common stock, suffered unnecessary

and unacceptable losses.

115.    Through their high ranking positions within the Company—especially the Director Defendants and executive Officer Defendants—Defendants knew or should have known of the existence of the above-mentioned problems.

116.    As a result of Defendants' knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Defendants made to the Plan's participants regarding the Plan's investment in Fannie Mae stock did not effectively inform the Plan's participants of the past, immediate, and future dangers of investing in Company stock.

117.    In addition, upon information and belief, Defendants failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.  Defendants also failed to conduct an appropriate investigation into whether Fannie Mae stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan's participants with information regarding Fannie Mae's problems.

118.    An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in Fannie Mae stock, under these circumstances—with undisclosed, substantial exposure to subprime mortgage-related losses—was clearly imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

119.    Because Defendants knew or should have known that Fannie Mae was not a prudent investment option for the Plan, they had an obligation to protect the Plan and their

participants from unreasonable and entirely predictable losses incurred as a result of the Plan' investment in Fannie Mae stock.

120.    Defendants had available to them several different options for satisfying this duty, including, among other things: making appropriate public disclosures as necessary; divesting the Plan of Fannie Mae stock; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; and/or resigning as fiduciaries of the Plan because, as a result of their employment by Fannie Mae, they could not loyally serve the Plan and its participants in connection with the Plan's acquisition and holding of Fannie Mae stock.

121.    Despite the availability of these and other options, Defendants failed to protect the Plan's assets from suffering immense losses from its imprudent continued investment in Fannie Mae common stock.

## G.    **DEFENDANTS SUFFERED FROM CONFLICTS OF INTEREST**

122.    Certain of Defendants had a very strong financial incentive to conceal the truth of the Company's potential exposure and keep the Company's stock price artificially high—and did exactly that. Fannie Mae's SEC filings, including Proxy Statements, during the Class Period make clear that a significant percentage of the CEO's and other Company Officers' annual compensation was in the form of equity awards that include stock options.

123.    As of March 31, 2008, Defendant Mudd owned 1,287,532 shares of Fannie Mae stock, including 597,156 exercisable options. Notably, while the FHFA will not allow the now-ousted Defendant Mudd to receive a "golden parachute" payment, Defendant Mudd remains eligible for his 401(k) account, with an estimated value of approximately $5.6 million. *See* James R. Hagerty, *Fannie, Freddie CEOs Still Get 401(k)s*, The Wall Street Journal (September

16, 2008).

124.    Because the compensation of at least some of the Defendants was significantly tied to the price of Fannie Mae stock, Defendants had incentive to keep the Plan's assets heavily invested in Fannie Mae stock on a regular, ongoing basis.  Elimination of Company stock as an investment option/vehicle for the Plan or honest disclosure regarding the Company's massive capital needs would have reduced the overall market demand for Fannie Mae stock and sent a negative signal to Wall Street analysts; both results would have adversely affected the price of Fannie Mae stock, resulting in reduced compensation for the Defendants.

125.    Some Defendants may have had no choice in tying their compensation to Fannie Mae stock (because compensation decisions were out of their hands), but Defendants did have the choice of whether to keep the Plan's assets tied to Fannie Mae stock or whether to properly inform participants of material negative information concerning the Company financial condition.

126.    These conflicts of interest put certain Defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plan participants and beneficiaries, whose interests the Defendants were obligated to loyally serve with an "eye single" to the Plan. *See In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 768 (S.D.N.Y. 2003) ("When administering or managing a plan, a fiduciary must act solely in the interest of beneficiaries."); *Hill v. BellSouth Corp.,* 313 F. Supp. 2d 1361, 1369-70 (N.D. Ga. 2004) (same).

## CLAIMS FOR RELIEF UNDER ERISA

127.    At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

128.    ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil

action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

129.    ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

130.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence* under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

131.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the *duties of loyalty, exclusive purpose and prudence* and are the "highest known to the law." *See Donovan v. Bierwirth,* 680 F.2d 263, 272, fn. 8 (2d Cir.1982*).*   They entail, among other things a duty to:

a.      conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

b.      avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries

themselves or the plan sponsor;

c.    disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

132.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> "…in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

133.    Plaintiff therefore brings this action under the authority of ERISA §502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA §404(a)(1) and ERISA §405(a).

## COUNT I

### Failure to Prudently and Loyally Manage the Plan's Assets
### (Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405 by All Defendants)

134.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

135.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

136.    The majority of Plan participants were not permitted to diversify their Plan accounts.  With respect to an ESOP, however, the Plan fiduciaries may not blindly invest in employer securities regardless of the circumstances.  To the contrary, while the duty to diversify does not apply to company stock investments *per se* in an ESOP, the fiduciaries remain bound by the other core ERISA fiduciaries duties, including the duties to act loyally, prudently and for the exclusive purpose of providing benefits to Plan participants.

137.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  Defendants were responsible for ensuring that all investments in the Company stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan.  Defendants are liable for losses incurred as a result of such investments being imprudent.

138.    A fiduciary's duty of loyalty and prudence requires him/her to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor

may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

139.     Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plan or Plan assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide Plan participants with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plan's investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan. This duty applies to all of the Plan's investment options, including investment in Company stock.

140.     Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period these Defendants knew or should have known that, as described herein, Fannie Mae common stock was not a suitable and appropriate investment for the Plan. Investment in Company stock during the Class Period clearly caused significant losses/depreciation to the Plan's assets. During the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect Plan participants from the inevitable losses that they knew or should have known would ensue as: (a) the mortgage crisis continued; (b) Fannie Mae continued to expand its portfolio and increase its exposure mortgage-related losses; (c) Fannie Mae was undercapitalized; and (d) Fannie Mae failed to disclose the truth regarding its massive need for a additional capital.

141.     Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding the Company's true financial condition, the

Company's concealment of the same and the consequent artificial inflation of the value of the Company stock and, generally, by conveying inaccurate information regarding the Company's future outlook. As such, participants in the Plan could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plan. Further, during the Class Period, the Company prohibited the majority of Plan participants from diversifying their Plan accounts.

142.     Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly or negligently participating in, or knowingly undertaking to conceal, the other Defendants failure to disclose crucial information regarding the Company's operations and artificial inflation of the price of the Company stock. Defendants knew or should have known of such breaches by other Plan fiduciaries, yet made no effort to remedy the same.

143.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

144.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

**Breach of Duty to Avoid Conflicts of Interest**
**(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by all Defendants)**

145.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

146.     At all relevant times, as alleged above, Defendants were fiduciaries within the

meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

147.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

148.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's massive investments in the Company's own securities; and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plan's investment in the Company's securities.

149.    As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered tens of millions of dollars in losses.  If Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

150.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

**Failure to Adequately Monitor Other Fiduciaries and
Provide Them with Accurate Information
(Breaches of Fiduciary Duties in Violation of ERISA § 404
by Fannie Mae & Director Defendants)**

151.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

152.     At all relevant times, as alleged above, Fannie Mae and the Director Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

153.     At all relevant times, as alleged above, the scope of the fiduciary responsibility of Fannie Mae and the Director Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including, without limitation, the Benefits Plans Committee and other Company employees and agents delegated duties with respect to the management and administration of the Plan and/or the Plan's assets.

154.     The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.  In this case, that means that the monitoring fiduciaries, Fannie Mae and the Director Defendants, had the duty to ensure that the monitored fiduciaries:

(1)     possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.  They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

(2)     are provided with adequate financial resources to do their job;

(3)     have adequate information to do their job of overseeing the Plan's investments;

(4)     have ready access to outside, impartial advisors when needed;

(5)     maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and

(6)   report regularly to the Company and/or the Director Defendants.   The Company and/or Director Defendants must then review, understand, and approve the conduct of the hands-on fiduciaries.

155.   Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not.   In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

156.   Fannie Mae and the Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company stock an imprudent Plan investment, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company stock, an investment that was imprudent and subject to inevitable and significant depreciation.   Fannie Mae and the Director Defendants knew or should have known that the fiduciaries they were responsible for monitoring were imprudently maintaining the Plan's massive investment in Fannie Mae common stock when it no longer was prudent to do so. Despite this knowledge, Fannie Mae and the Director Defendants failed to take action to protect the Plan, and concomitantly the Plan's participants, from the consequences of these fiduciaries' failures.

157. In addition, Fannie Mae and the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of Fannie Mae that they knew or should have known that these Defendants needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

158. Fannie Mae and the Director Defendants are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

159. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

160. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## CAUSATION

161. The Plan suffered tens of millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in Company stock during the Class Period, in breach of Defendants' fiduciary duties. These losses were reflected in the diminished account balances of the Plan's participants.

162. The majority of Plan participants were not permitted to diversify their Plan accounts. With respect to an ESOP, however, the Plan fiduciaries may not blindly invest in

employer securities regardless of the circumstances. To the contrary, while the duty to diversify does not apply to company stock investments *per se* in an ESOP, the fiduciaries remain bound by the other core ERISA fiduciaries duties, including the duties to act loyally, prudently and for the exclusive purpose of providing benefits to Plan participants.

163. With respect to those few participants who were permitted to diversify, Defendants are responsible for losses caused by participants' failure to exercise voluntary diversification options because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. By failing to apprise participants of the problems within the Company and of the fact that the Company stock price was artificially inflated, as further described *infra*, Defendants misrepresented the soundness of Company stock as an investment vehicle. As a consequence, participants did not exercise independent control over their investments in the Company stock, and Defendants remain liable under ERISA for losses caused by such investment.

164. Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and participants would have avoided a substantial portion of the losses that they suffered through their continued investment in the Company stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

165. As noted above, as a consequence of the Defendants' breaches, the Plan suffered significant losses.

166. ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any

person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

167.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

168.    Plaintiff, the Plan, and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

169.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## SECTION 404(c) DEFENSE INAPPLICABLE

170.    The Plan suffered losses, and Plaintiff and the other Class members suffered losses, because substantial assets in the Plan were invested in Fannie Mae stock during the Class Period in violation of the Defendants' fiduciary duties.

171.    Defendants were responsible for the prudence of investments provided under the Plan during the Class Period, unless the Plan satisfied the procedural and substantive requires of ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

172.    Section 404(c) provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions, but not for liability for the selection of imprudent investment options for the Plan.    In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions.    In addition, § 404(c) only applies if participants are informed that "the Plan is intended to constitute a Plan described in § 404(c) and [the regulations], and that fiduciaries of the Plan may be relieved of liability for any losses which are the direct and necessary result of investment instructions given by such participants or beneficiary." 29 C.F.R. § 2550.404c-1(b)(2)(B)(1)(i).

173.    In addition, § 404(c) does not apply to any portion of the Plan: (1) derived from Company matching or profit-sharing contributions, where those investments/investment vehicles were made/invested by/through the sole discretion of the Company; or (2) deemed an ESOP, in that the Secretary of Labor has interpreted the provision to apply only to plans that provide plan participants with a full range of investment options, which an ESOP, by its very nature, does not. *See* 29 C.F.R. § 2550.404c-1.

174.    ERISA § 404(c) does not and cannot provide any defense to the fiduciaries' imprudent decision to continue the Plan's investments in Fannie Mae stock, as this is not a

decision that was made or controlled by the participants. As alleged above, participants did not exercise the requisite independent control over the investment of their Plan accounts in Fannie Mae stock. Thus, a fiduciary breach or an investment loss in connection with the Defendants' selection and maintenance of Fannie Mae stock as an investment for the Plan is not afforded relief under section 404(c) because it was not the result of participants' exercise of control.

175. The Defendants' liability to the Plan, Plaintiff and the Class for relief stemming from the Plan's imprudent investments in Fannie Mae stock, is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period, without regard to whether or not the participants relied upon statements, acts, or omissions of Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for:

A. A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B. A Declaration that Defendants, collectively and separately, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D. Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.     An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in the common stock of Fannie Mae maintained by the Plan in proportion to the accounts' losses attributable to the decline in the stock price of Fannie Mae;

G.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H      An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.     An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

DATED: October 23, 2008                    Respectfully submitted,

                                           **TYDINGS & ROSENBERG LLP**

                              By:          _____
                                           John B. Isbister (D.C. Bar No. 277418)
                                           Toyja E. Kelley (D.C. Bar No. 482977)
                                           100 East Pratt Street
                                           Baltimore, MD 21202
                                           Tel.: (410) 752-9700
                                           Fax: (410) 727-5460
                                           jisbister@tydingslaw.com

                                           **HARWOOD FEFFER LLP**
                                           Robert I. Harwood
                                           Samuel K. Rosen
                                           488 Madison Avenue
                                           New York, New York 10022
                                           Tel.: (212) 935-7400

**MAJOR KAHN LLC**
Major Kahn
20 Bellevue Street
Weehawken NJ 07086
Tel: 646-546-5664

*Counsel for ERISA Plaintiff*

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

08-1825
RJL

## I. (a) PLAINTIFFS

MARY P. MOORE, individually and on behalf of all others similarly situated

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    88888
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

John B. Isbister (D.C. Bar No. 277418)
Toyja E. Kelley (D.C. Bar No. 482977)
Tydings & Rosenberg LLP,
100 E. Pratt St., 26th Floor
Baltimore, Maryland 21202

## DEFENDANTS

Federal National Mortgage Association Compensation Committee, Federal National Mortgage Association Benefit Plans Committee, Daniel H. Mudd, Stephen B. Ashley, Louis J. Freeh, Brenda J. Gaines, Bridget A. Macaskill, Greg C. Smith, David C. Hisey, and John Does 1-10.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    11001
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

Case: 1:08-cv-01825
Assigned To : Leon, Richard J.
Assign. Date : 10/23/2008
Description: Labor-ERISA

JURY ACTION

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
● 3 Federal Question (U.S. Government Not a Party)

○ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

## ○ E. General Civil (Other)    OR    ○ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

○ **G. Habeas Corpus/ 2255**

☐ 530 Habeas Corpus-General
☐ 510 Motion/Vacate Sentence

○ **H. Employment Discrimination**

☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)

*(If pro se, select this deck)*

○ **I. FOIA/PRIVACY ACT**

☐ 895 Freedom of Information Act
☐ 890 Other Statutory Actions (if Privacy Act)

*(If pro se, select this deck)*

○ **J. Student Loan**

☐ 152 Recovery of Defaulted Student Loans (excluding veterans)

---

◉ **K. Labor/ERISA (non-employment)**

☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Labor Railway Act
☐ 790 Other Labor Litigation
☒ 791 Empl. Ret. Inc. Security Act

○ **L. Other Civil Rights (non-employment)**

☐ 441 Voting (if not Voting Rights Act)
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights
☐ 445 American w/Disabilities-Employment
☐ 446 Americans w/Disabilities-Other

○ **M. Contract**

☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholder's Suits
☐ 190 Other Contracts
☐ 195 Contract Product Liability
☐ 196 Franchise

○ **N. Three-Judge Court**

☐ 441 Civil Rights-Voting (if Voting Rights Act)

---

**V. ORIGIN**

◉ 1 Original Proceeding
○ 2 Removed from State Court
○ 3 Remanded from Appellate Court
○ 4 Reinstated or Reopened
○ 5 Transferred from another district (specify)
○ 6 Multi district Litigation
○ 7 Appeal to District Judge from Mag. Judge

---

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

29 U.S.C. sections 1109 and 1132 - breach of fiduciary duty by managers of the Federal National Mortgage Association Employee Stock Ownership Plan

---

**VII. REQUESTED IN COMPLAINT** ☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ ⌐ To Be ¬ Determined ⌐ ¬ Check YES only if demanded in complaint
**JURY DEMAND:** YES ☒ NO ☐

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☒ NO ☐ If yes, please complete related case form.

DATE October 23, 2008 SIGNATURE OF ATTORNEY OF RECORD

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

